**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CRIMINAL ACTION |
| v. ) | |
| ) | No. 08-20153-01/02-KHV |
| DARRON L. ESKRIDGE and ) | |
| ) | |
| JOHN T. ROLAND, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**MEMORANDUM AND ORDER**

On November 5, 2008, a grand jury charged Darron L. Eskridge with one count of possessing a firearm after having been convicted of three or more violent felonies, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and 924(e)(1). The grand jury also charged John T. Roland with one count of possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). This matter is before the Court on Eskridge's Motion To Suppress Evidence (Doc. #28) and Roland's Motion To Suppress Evidence And Memorandum In Support (Doc. #29) both filed March 9, 2009. On April 1 and 2, 2009, the Court held an evidentiary hearing. For reasons stated below, the Court finds that the motions should be overruled.

**Facts**

Based on testimony and exhibits received at the hearing, the Court finds the following facts:

On September 23, 2008 at approximately 10:00 a.m., Captain William Howard, Jr. of the Police Department of Kansas City, Kansas ("KCKPD") was driving northbound on Hutton Road in a relatively unpopulated area of Wyandotte County, Kansas. Captain Howard was in full uniform

and was driving an unmarked Crown Victoria, a model commonly used as a police cruiser. The cruiser had police lights mounted in the grill and a spotlight mounted on the side.

Hutton Road is a two-lane paved road with a speed limit of 40 miles per hour. As Officer Howard came around a slight bend at the crest of a hill, he observed a black Mercury Mountaineer approximately one-half mile ahead. The Mountaineer had pulled off the roadway in the ditch, facing northbound on the east side of Hutton Road. The vehicle was approximately 30 yards north of a driveway which emptied onto the east side of Hutton Road. Howard has traveled this portion of Hutton Road almost daily for 12 years and he has never seen a vehicle stopped in this location. He initially thought that someone might be urinating on the roadside.

As he got closer to the Mountaineer, Captain Howard saw a man standing outside the car but leaning into the rear passenger compartment and "working feverishly" with his arms. Captain Howard had a "dozen fleeting thoughts" about what might be occurring. For example, he thought that the man might be assaulting someone, restraining someone or perhaps spanking a child in the back seat. Officer Howard tapped on his brakes and slowed as he neared the vehicle. When the man saw Captain Howard looking at him, he stood up straight and looked back at Captain Howard with what Howard described as a "deer in the headlights" look. The man did not flag Captain Howard down or wave at him, which Captain Howard testified would have eased his concern. At that point, Captain Howard decided to stop and investigate the situation. Because of traffic, however, he did not immediately pull over; rather, he decided to turn around at the next intersection. In his rearview mirror, as he drove past the Mountaineer, Captain Howard saw the man walk around the vehicle and get into the driver's seat.

Captain Howard continued northbound on Hutton Road about one quarter of a mile to the nearest intersection, where he turned around and headed south on Hutton Road. After he turned around and headed south, however, he could not see the Mountaineer. As Captain Howard approached the spot where the Mountaineer had been parked, he saw that it had backed into the driveway south of where it had been pulled off the road. The Mountaineer was slowly nosing out of the driveway and the driver appeared indecisive, as if he wanted to turn right (north), but then started to turn left and waited for Captain Howard's car to pass. Captain Howard slowed and stopped his vehicle near the entrance of the driveway and motioned to the driver to go ahead of him. The Mountaineer turned left (southbound) onto Hutton Road. Captain Howard testified that he then activated his emergency lights and stopped the vehicle because he suspected that an assault or something had just occurred and that he needed to investigate.

After he stopped the vehicle, Captain Howard approached the driver's side, looked in and saw the driver (later identified as Eskridge) and a passenger (later identified as Roland) in the front. Captain Howard asked Eskridge if anything was wrong and Eskridge replied that he had pulled over to wipe some crumbs out of the back seat. Captain Howard saw electronic equipment under Roland's feet and in the back seat. Captain Howard asked Eskridge where he was going and he replied that he had been at a friend's house on 22nd Street in Kansas City, Kansas and was lost.[1]

Captain Howard asked Eskridge for his license, then returned to his patrol car. When Captain Howard ran Eskridge's name through the computer system it showed that Eskridge had prior felony convictions for burglary. He called dispatch for backup and within a short time, two

---

[1] Captain Howard knew that 22nd Street was nearly ten miles from where he had stopped the Mountaineer.

KCKPD police officers arrived. One of them looked in the Mountaineer and reported to Captain Howard that there was a handgun on the driver's side floorboard.[2] Eskridge told the officers that it was a pellet gun and that the pellets were in the back seat. Captain Howard asked Eskridge if he could verify that by searching the vehicle and Eskridge consented.

Captain Howard found pellets in the back seat and noticed a large wooden box with the name "Kyle" carved into it. Captain Howard asked Eskridge who "Kyle" was, and Eskridge seemed unfamiliar with the name. Captain Howard found a document in the Mountaineer that identified Kyle McMeans, 4847 N. 93th, Kansas City, Kansas. Captain Howard asked the dispatcher to have an officer check that address, and within a relatively short time, a KCKPD officer advised Captain Howard that he had arrived at the residence and observed signs of forced entry. Not long after that, the homeowners arrived at the residence and determined that someone had taken a number of items from the residence, including electronics and several firearms.

Officers searched the roadside where Captain Howard had first observed the Mountaineer and found personal items from the McMeans' residence, including a purse, documents and identification. A full search of the vehicle revealed all of the stolen items except for some missing firearms. Captain Howard later returned to the driveway area and found a .22 mag Liberty Scout revolver, serial number 550588 and a 12 gauge Jing An shotgun, Model PH 12-1, serial number 9602504, both of which he confirmed to be stolen from the McMeans' residence.

---

[2] At that point the officers handcuffed Eskridge.

## **Analysis**

Defendants seek to suppress all evidence which officers obtained as a result of the stop of the Mountaineer. Defendants' motion raises only one issue: whether Captain Howard had reasonable suspicion to stop defendants' vehicle.

The Tenth Circuit has defined three categories of police/citizen encounters: (1) voluntary cooperation in response to non-coercive questioning, (2) investigatory and (3) arrest. United States v. Muldrow, 19 F.3d 1332, 1335 (10th Cir.) (citing United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir.), cert. denied, 467 U.S. 1255 (1984)), cert. denied, 513 U.S. 862 (1994); see Terry v. Ohio, 392 U.S. 1, 21-23 (1968). This case involves the second category: an investigatory or Terry stop. See United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005) (traffic stops are seizures analogous to investigative detentions).

Law enforcement officers may stop and briefly detain a person for investigative reasons if the officer has a reasonable suspicion that criminal activity may be afoot. United States v. Sokolow, 490 U.S. 1, 7 (1989). Reasonable suspicion requires a "particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). There must be "specific and articulable facts" to support a finding of reasonable suspicion. Terry, 392 U.S. at 21. Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. United States v. Arvizu, 534 U.S. 266, 274 (2002).

In determining whether reasonable suspicion existed, the Court considers the totality of the circumstances. Sokolow, 490 U.S. at 8. Courts may not evaluate and reject each contributing factor

in isolation, for reasonable suspicion can exist even if each individual observation is susceptible of innocent explanation. United States v. Guerrero, 472 F.3d 784, 787 (10th Cir. 2007). Rather, even factors that are entirely innocent when taken separately can support a lawful detention if, taken together, they reasonably suggest the presence of illegal conduct. United States v. Wallace, 429 F.3d 969, 975-76 (10th Cir. 2005).

In analyzing whether a given set of factors gives rise to the requisite reasonable suspicion, the Court must "be careful to judge the officer's conduct in light of common sense and ordinary human experience but also to grant deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances." Id. (further citations omitted). The government bears the burden of proving the reasonableness of the officer's suspicion. United States v. Salzano, 158 F.3d 1107, 1111 (10th Cir. 1998); see also United States v. Lutz, 207 F. Supp.2d 1247, 1255 (D. Kan. 2002) (government must show traffic stop justified by reasonable articulable suspicion of illegal activity).

Here, the parties agree that Captain Howard "seized" Eskridge and Roland for purposes of the Fourth Amendment when he activated his emergency lights and stopped the Mountaineer. The legality of the stop therefore turns on the extent to which Captain Howard could reasonably suspect that defendants were involved in a crime at the point when he stopped the Mountaineer.[3]

The government argues that Captain Howard had an objectively reasonable suspicion of illegal activity based on the facts that (1) the Mountaineer was pulled off of Hutton Road in an unusual spot, (2) Eskridge had been leaning in the back passenger side door, "feverishly" doing

---

[3] The government has not argued that Captain Howard suspected that Eskridge committed any traffic violation which would have justified a stop.

something with his arms, (3) as Captain Howard slowed down and drove past, Eskridge straightened up and gave him a "deer in the headlights" look; (4) Eskridge backed the vehicle an unusual distance up the driveway in order to turn around; and (5) when Captain Howard drove back toward him, Eskridge started to turn to the right but then hesitated and turned to the left.

The Court first notes that Captain Howard was a very credible witness and his testimony was undisputed. Captain Howard was direct in responding to the questions of both the government and defense counsel. When Captain Howard saw Eskridge "working feverishly" in the back seat, he thought that Eskridge might be assaulting someone. On cross-examination, he testified that Eskridge's activity "could have been anything." See United States v. Salazar, No. 08-20084-KHV, 2009 WL 352605, *4 n.2 (D. Kan. Feb. 12, 2009), appeal docketed, No. 09-3073 (10th Cir. Mar. 18, 2009) (no reasonable suspicion where officer saw pickup truck pull into parking lot at 10:00 p.m., back up next to commercial vehicle, turn lights off and then start to drive off as officer approached in patrol car). Eskridge gave him a "deer in the headlights" look when Captain Howard passed by, however, and at that point, Howard decided that he needed to stop and investigate. As Captain Howard turned around and drove south back down Hutton Road, Eskridge backed up a considerable distance in the driveway – farther than needed to safely execute a U-turn. Finally, as Eskridge started to leave the driveway, he appeared to start to turn right and then hesitated and ultimately turned left. Viewed through the lens of an experienced police officer, these circumstances added up to a reasonable suspicion that the occupants of the Mountaineer were involved in criminal activity. See United States v. Zambrano, 76 Fed. Appx. 848, 85-51 (10th Cir. 2003) (combined with other factors, person's reaction to law enforcement officers can tip scales in favor of articulable suspicion); State v. Halstead, 414 A.2d 1138, 1148-49 (R.I. 1980) (reasonable suspicion where

occupants of truck "gawked" at police and were traveling slowly in early morning hours in rental vehicle); see also Illinois v. Wardlow, 528 U.S. 119, 125 (2000) (although individual's conduct may be ambiguous and susceptible to innocent explanation, officers may detain individual to resolve ambiguity); cf. State v. Wade, 390 So. 2d 1309, 1312 (La. 1980) (court may consider common knowledge that certain type of vehicle used for unmarked patrol).  Defendants do not challenge the lawfulness of the events after the stop.  The Court therefore overrules defendants' motions to suppress the evidence which officers obtained as a result of the stop.

**IT IS THEREFORE ORDERED** that Eskridge's Motion To Suppress Evidence (Doc #28) and Roland's Motion To Suppress Evidence And Memorandum In Support (Doc. #29) both filed March 9, 2009 be and hereby are **OVERRULED.**

Dated this 14th day of April, 2009, at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge